Christopher R. Belmonte, Esq.
Pamela A. Bosswick, Esq.
Duane Morris LLP
230 Park Avenue, Suite 1130
New York, New York 10169
Telephone: (212) 818-9200

and

Stephen Sorensen, Esq. (CA No. 199408)
Thomas, Alexander, Forrester and Sorensen LLP
14 27th Avenue
Venice, California 90291
Telephone: (310) 961-2536

*Attorneys for Howard M. Ehrenberg,*
*Liquidating Trustee*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

| In re: | Chapter 11 |
|---|---|
| ORION HEALTHCORP, INC. | Case No. 18-71748 (AST) |
| CONSTELLATION HEALTHCARE TECHNOLOGIES, INC. | Case No. 18-71749 (AST) |
| NEMS ACQUISITION, LLC | Case No. 18-71750 (AST) |
| NORTHEAST MEDICAL SOLUTIONS, LLC | Case No. 18-71751 (AST) |
| NEMS WEST VIRGINIA, LLC | Case No. 18-71752 (AST) |
| PHYSICIANS PRACTICE PLUS, LLC | Case No. 18-71753 (AST) |
| PHYSICIANS PRACTICE PLUS HOLDINGS, LLC | Case No. 18-71754 (AST) |
| MEDICAL BILLING SERVICES, INC. | Case No. 18-71755 (AST) |
| RAND MEDICAL BILLING, INC. | Case No. 18-71756 (AST) |
| RMI PHYSICIAN SERVICES CORPORATION | Case No. 18-71757 (AST) |
| WESTERN SKIES PRACTICE MANAGEMENT, INC. | Case No. 18-71758 (AST) |
| INTEGRATED PHYSICIAN SOLUTIONS, INC. | Case No. 18-71759 (AST) |
| NYNM ACQUISITION, LLC | Case No. 18-71760 (AST) |
| NORTHSTAR FHA, LLC | Case No. 18-71761 (AST) |
| NORTHSTAR FIRST HEALTH, LLC | Case No. 18-71762 (AST) |
| VACHETTE BUSINESS SERVICES, LTD. | Case No. 18-71763 (AST) |
| MDRX MEDICAL BILLING, LLC | Case No. 18-71764 (AST) |
| VEGA MEDICAL PROFESSIONALS, LLC | Case No. 18-71765 (AST) |
| ALLEGIANCE CONSULTING ASSOCIATES, LLC | Case No. 18-71766 (AST) |
| ALLEGIANCE BILLING & CONSULTING, LLC | Case No. 18-71767 (AST) |
| PHOENIX HEALTH, LLC | Case No. 18-71789 (AST) |
| NEW YORK NETWORK MANAGEMENT, L.L.C., | Case No. 18-74545 (AST) |
| Debtors. | (Jointly Administered) |

| | |
|---|---|
| HOWARD M. EHRENBERG, as Liquidating Trustee of the Orion Liquidating Trust,<br><br>Plaintiff,<br><br>v.<br><br>ROSENBERG RICH BAKER BERMAN & COMPANY,<br><br>Defendant. | Adv. Pro. No.:<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT AND OBJECTION TO PROOF OF CLAIM**

Plaintiff, Howard M. Ehrenberg (the "**Liquidating Trustee**"), in his capacity as the Liquidating Trustee of the Orion Liquidating Trust (the "**Trust**") and as the assignee of certain claims assigned to the Trust by Bank of America, N.A., BMO Harris Bank, N.A., Keybank National Association, Stifel Bank & Trust and Woodforest National Bank (collectively, the "**Lenders**"), by and through his attorneys, Duane Morris LLP and Thomas, Alexander, Forrester and Sorensen LLP, as and for his complaint against Defendant, Rosenberg Rich Baker Berman & Company ("**RRBB**"), alleges on information and belief as follows:

**NATURE OF THE ACTION**

1. As certified public accountants, RRBB was licensed by the State of New Jersey to audit the financial statements of Orion HealthCorp, Inc., Constellation Healthcare Technologies, Inc. and their subsidiaries (collectively, "**The Orion Group**"). As The Orion Group's auditor, RRBB's duty to the public, including the Beneficiaries, as defined below, of the Trust and, more specifically, the Lenders, was to provide reasonable assurance that those financial statements presented fairly, in all material respects, the financial position of The Orion Group such that the financial statements were free of material misstatement due to error or fraud. Fundamentally,

RRBB's job was to detect fraud and/or material misstatements in The Orion Group's financial statements.

2. As specifically stated on RRBB's website (https://www.rrbb.com/services/for-businesses/auditingfinancial-reporting/):

> An audit provides the highest level of assurance on a company's financial statements. In an audit, the CPA firm examines financial statements by conferring with outside parties, completing physical inspections and observations, and testing selected transactions by examining supporting documents. An audit provides assurance that the "financial statements are free of material misstatement and are fairly presented". An effective audit should also add value by providing practical suggestions to strengthen internal controls, improve operational efficiency, and enhance systems and procedures.

3. Each year, for the years 2014 through 2016, RRBB falsely and negligently certified that The Orion Group's financial statements were "free of material misstatement" and provided The Orion Group with clean audit reports that RRBB knew would be relied upon by the Beneficiaries, as defined below, of the Trust, including the Lenders.

4. RRBB's certifications were not true. The Orion Group's financial statements were grossly misstated and concealed a massive fraud that RRBB would have, and should have, discovered had RRBB not been negligent.

5. Had RRBB done its job, it would have discovered that the financial statements were materially misstated. In addition, had RRBB done its job, it would have discovered a massive fraud being perpetrated by The Orion Group's Chief Executive Officer, Paul Parmar ("**Parmar**"), and others (collectively, the "**Looters**"). These fraudsters acted adversely to, and without the authority of, The Orion Group to steal more than one hundred million dollars from The Orion Group. The Orion Group received no short or long-term benefit from the fraud by the Looters. The Looters fabricated hundreds of millions of dollars of fake transactions and reported

fake assets on the financial statements of The Orion Group. It was RRBB's job to confirm that these transactions actually occurred and that these assets actually existed. RRBB failed to do its job.

6. The Lenders, relied on RRBB to do its job. In reliance on RRBB's audit reports certifying that The Orion Group's financial statements were free of material misstatement due to error or fraud, The Orion Group and the Lenders entered into various credit and loan transactions in which The Orion Group incurred more than $160 million in debt issued by the Lenders. Through the fake transactions which RRBB failed to detect, The Orion Group was looted of, and incurred more than, $160 million dollars in debts that it is unable to repay to the Lenders.

7. RRBB's failure to do its job caused more than $160 million in damages to the Lenders. The Orion Group cannot repay the $160 million in debt which the Lenders issued to The Orion Group as a result of RRBB's negligence, and the Lenders are damaged by their reliance on the materially false financial statements, which induced the latter to enter into the transactions and issue in excess of $160 million in debt.

8. If RRBB had done its job as auditor, it would not have certified The Orion Group's financial statements and/or would have discovered the fraud in its infancy. For example, if RRBB had simply tested for the occurrence of material transactions and the existence of material assets, as it was required to do, it would have discovered the material misstatements and/or the fraud as early as May 2015.

9. If RRBB had done its job, the innocent directors and managers of The Orion Group who were not involved in the Looters' fraud could and would have stopped the looting of The Orion Group and prevented The Orion Group from taking on debts that it could not repay.

10. Instead, RRBB allowed the fraud to grow through its false certifications of The Orion Group's financial statements. RRBB repeatedly ignored red flags in reckless disregard of its public duty as an auditor. All the time that the Looters were carrying out their fraud against The Orion Group, RRBB certified the existence of hundreds of millions of dollars of The Orion Group's assets that did not exist and the occurrence of hundreds of millions of dollars of transactions that did not occur.

11. RRBB owed the Lenders a duty under settled law, because it knew that they would be receiving and relying on RRBB's audit opinions on the financial statements of The Orion Group for the transactions at issue in this Complaint. By negligently performing its audits and negligently certifying the financial condition of The Orion Group, RRBB breached its duty to the Lenders, whose claims were assigned to Trust, on behalf of which the Liquidating Trustee is the Plaintiff herein.

12. Moreover, the Lenders were part of the public to which RRBB, as certified *public* accountants, owed a duty. RRBB's public role as certified public accountants auditing financial statements is so important that the United States Supreme Court has declared RRBB the "public watchdogs," because counterparties like the Lenders depend on RRBB to do its job and to certify only true financial statements:

> By certifying the public reports that collectively depict a corporation's financial status, **the independent auditor assumes a *public* responsibility** transcending any employment relationship with the client. The independent public accountant performing this special function **owes ultimate allegiance** to the corporation's creditors and stockholders, as well as **to the investing public**. This **"public watchdog"** function demands that the accountant maintain total independence from the client at all times and requires **complete fidelity to the public trust**.

*United States v. Arthur Young & Co.*, 465 U.S. 805, 817-18, 104 S. Ct. 1495, 1503 (1984)) (emphasis added).

13. Still further, the ethical standards governing RRBB in this case make clear that the Lenders were specifically among the public RRBB serves and owed a duty to: the public relying upon RRBB includes "clients, credit grantors, governments, employers, investors, the business and financial community, and the others who rely on the objectivity and integrity of certified public accountants to maintain the orderly functioning of commerce." American Institute of Certified Public Accountants ("**AICPA**") Code of Prof. Conduct, ET § 53. Moreover, the ethical standards required RRBB's "*acceptance of its responsibility to the public*." *See id.*

14. RRBB thus served as the "public watchdog" to determine whether the financial statements prepared by management of The Orion Group were misstated due to error or fraud. RRBB—and only RRBB— acted as the gatekeeper between The Orion Group management and the public, including the Lenders.

15. But RRBB failed to do its job as a public watchdog by failing to detect material misstatements and a massive fraud and by giving its seal of approval to The Orion Group's grossly misstated financial statements.

16. Violating its duty to the Lenders and the public, RRBB repeatedly shut its eyes to red flags demonstrating that The Orion Group's financial statements were materially misstated and that, if they had been investigated, they would have revealed the fraud. RRBB's conduct was reckless and constitutes gross negligence.

17. RRBB's gross negligence caused the Lenders to lose more than $160 million dollars. Had RRBB done its job properly and stated that there were material misstatements in The Orion Group's financial statements, the Lenders would not have suffered these losses.

18. By this action, Plaintiff, on behalf of the Trust, as assignee of the claims of the Lenders, seeks to hold RRBB responsible for these damages.

**THE PARTIES**

19. Plaintiff Liquidating Trustee Howard M. Ehrenberg is an individual and a citizen of California, with an office address at **Sulmeyer**Kupetz, A.P.C., 333 South Grand Avenue, Suite 3400, Los Angeles, CA 90071.

20. Defendant RRBB is a professional corporation and a citizen of New Jersey, having its principal place of business at 265 Davidson Ave., Suite 210, Somerset, New Jersey 08873.

**JURISDICTION AND VENUE**

21. This Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b), in that this action arises in and/or relates to the Debtors' chapter 11 bankruptcy cases. To the extent any part of this adversary proceeding is "non-core", Plaintiff does not consent to the entry of final orders and judgments by the Bankruptcy Court.

22. This action is additionally brought under Federal diversity jurisdiction, 28 U.S.C. § 1332, as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.

23. This Court has jurisdiction over Defendant RRBB on the basis of the proof of claim filed by RRBB on June 4, 2018, in the amount of $193,410 (the "**RRBB Claim**").

24. Venue is proper in this District pursuant to 28 U.S.C. § 1409.

**The Liquidating Trust and Assignment of Lenders' Claims**

25. The Trust is a liquidating grantor trust created in accordance with the confirmed Debtor's Third Amended Joint Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code, dated as of January 6, 2019 (the "**Plan**"), in the bankruptcy case captioned, *In re Orion HealthCorp, Inc., et al.,* Chapter 11, Case No. 18-71748 (AST) (Jointly Administered), for the benefit of holders of certain claims against the Debtors' estates, including Allowed Secured

Lender Claims, Allowed Secured Lender Deficiency Claims, Allowed General Unsecured Claims, and Allowed Subordinated Claims, as those claims are defined in the Plan (collectively, the "**Beneficiaries**").

26. Pursuant to the Plan and the Liquidating Trust Agreement, the Trust's assets include, among other things, all "Causes of Action" of the Debtors, with the exception of those expressly waived in the Plan, and all "Assigned Causes of Action", which latter terms mean any and all "Causes of Action" assigned to the Trust by any "Person" pursuant to the Plan. Plan, p. 9; Liquidating Trust Agreement, §1.2.

27. Pursuant to the Plan, the Liquidating Trust Agreement, and the Assignment of Secured Lenders' Claims or Proceeds and Cooperation Agreement, the Lenders transferred and assigned to the Trust any and all "Causes of Action" they may have against any "Person" who is not a Debtor, related directly or indirectly to the Debtors and their estates, whether arising before or after the petition date, March 16, 2018 (the "**Petition Date**"). Plan, §4.1(c); Liquidating Trust Agreement, §1.2.

28. The Liquidating Trustee has the power to, among other things, prosecute, compromise and settle, abandon, assign or dismiss for the benefit of the Beneficiaries all claims, rights and causes of action transferred to the Trust (whether such suits are brought in the name of the Liquidating Trustee or otherwise). Liquidating Trust Agreement, §§3.7, 3.8.

## FACTUAL BACKGROUND

### Corporate History

29. The Orion Group is a consolidated enterprise of several companies aggregated through a series of acquisitions, which operate the following businesses: (a) outsourced revenue cycle management ("**RCM**") for physician practices, (b) physician practice management, (c) group purchasing services for physician practices, and (d) an independent practice association

business, which is organized and directed by physicians in private practice to negotiate contracts with insurance companies on their behalf while such physicians remain independent and which also provides other services to such physician practices.

30. The entity that is currently named Orion HealthCorp, Inc. ("**Orion**") was incorporated in Delaware in 1984 under the name Technical Coatings Incorporated. On September 10, 1984, its name was changed to Technical Coatings, Inc. On July 11, 1999, its name was changed to Surgicare, Inc., and, in 1999, it was registered for trading on U.S. exchanges.

31. In 2004, Surgicare, Inc.'s name was changed to Orion HealthCorp, Inc., and it subsequently acquired Integrated Physician Solutions, LLC ("**IPS**") and Medical Billing Services, Inc. ("**MBS**"). In 2006, Orion acquired Rand Medical Billing, Inc. ("**Rand**").

32. Constellation Healthcare, LLC ("**CHLLC**") was formed as an investment vehicle by Parmar and Southport Lane Asset Management, LLC specifically for the purposes of acquiring Orion and its operating subsidiaries and to pursue an acquisition strategy in the RCM market. On June 17, 2013, the entire issued share capital of Orion was acquired by CHLLC. Accordingly, as of the date of Parmar's acquisition, Orion was the parent of IPS, MBS, Rand, RMI Physician Services ("**RMI**"), and Western Skies Management ("**Western Skies**").

33. In June 2014, investment entities managed by Parmar acquired all of the ownership interests of CHLLC. Constellation Healthcare Technologies, Inc. ("**CHT**") was formed to become the holding company for Orion and its subsidiaries for the purposes of a public listing on London Stock Exchange's Alternative Investments Market ("**AIM**"). CHT was to acquire the entire issued share capital of Orion immediately prior to CHT's admission to

trading on AIM. Immediately after its admission to trading on AIM, CHLLC was to become the controlling shareholder of CHT holding approximately 68.1 percent of the voting rights in CHT.

34. The going public transaction was consummated on December 8, 2014, and CHT was admitted to trading on AIM on the London Stock Exchange (the "**Going Public Transaction**"). At the time of the Going Public Transaction, CHT was the immediate holding company of Orion, which was in turn the direct or indirect parent company of eight (8) subsidiaries that formed the enterprise at that time, including IPS, MBS, Rand, RMI, Western Skies, NEMS Acquisition, LLC ("**NEMS Acquisition**"), Northeast Medical Solutions LLC ("**NEMSLLC**"), and NEMS West Virginia ("**NEMSWV**").

35. CHT purportedly acquired Physicians Practice Plus, an RCM business, for a maximum cash consideration of up to $20.0 million. In connection with this acquisition, Arvind Walia, founder and Chief Executive Officer, joined CHT as the Chief Technology Officer of the enlarged group. As a result of this transaction, Orion became the holding company for Physicians Practice Plus Holdings, LLC ("**PPP HoldCo**") and its operating subsidiary, Physicians Practice Plus, LLC ("**PPP OpCo**").

36. In May 2015, pursuant to a secondary placing of its shares, CHT raised approximately $20.0 million. The stated purpose of the secondary offerings was to allow for certain of the acquisitions discussed below.

37. On September 16, 2015, CHT purportedly acquired NorthStar First Health ("**Northstar**"), an RCM business, for a maximum consideration of $18.0 million. As a result of this transaction, Orion purportedly became the owner of Northstar FHA, LLC ("**Northstar FHA**"), a holding company, which in turns owns Northstar First Health, LLC ("**Northstar FH**"),

another holding company, which in turn owns Vachette Business Services, LLC ("**Vachette**"), the operating subsidiary. However, as discussed below, the Northstar transaction was fictitious.

38. On September 18, 2015, CHT purportedly acquired Phoenix Health LLC ("**Phoenix**"), an RCM business, for a maximum consideration of $14.0 million. Orion became the parent company of Phoenix. However, as discussed below, Phoenix was an entity created by Parmar that conducted no business and had no assets.

39. On February 10, 2016, CHT purportedly acquired MDRX Billing LLC ("**MDRX**"), an alleged billing practice management company, for $28.0 million with a further $2.0 million in cash due upon completion of certain targets. As a result of this transaction, Orion became the parent company of MDRX. However, as discussed below, the MDRX transaction was fictitious.

40. On September 23, 2016, CHT purportedly acquired Vega Medical Professionals LLC ("**Vega**"), an RCM business, for $24.0 million including certain consideration in the form of earn outs.

41. As a result of the foregoing transactions, before the go-private transaction discussed below, CHT was the immediate holding company of Orion, which was, in turn, the immediate or intermediate holding company of eighteen (18) subsidiaries that formed the enterprise at that time, which included IPS, MBS, Rand, RMI, Western Skies, NEMS Acquisition, NEMSLLC, NEMSWV, PPP HoldCo, PPP OpCo, Northstar FHA, Northstar FH, Vachette, Phoenix, MDRX, Vega, Allegiance Consulting Associates ("**ACA**"), and Allegiance Billing & Consulting ("**ABC**").

**The Go Private Transaction**

42. On November 25, 2016, CHT and CHT Holdco, LLC ("**CHT Holdco**") announced that they had reached agreement on the terms of a recommended acquisition under

which CHT Holdco was to acquire CHT at an acquisition price of $2.93 cash and $0.43 in promissory notes per share, pursuant to the terms of an agreement and plan of merger, dated November 24, 2016 (the "**Merger Agreement**"), between CHT, CHT Holdco, CHT Mergersub, Inc., Orion, and a private equity firm. (CC Capital Management (the "**Sponsor**") was party to the Merger Agreement for a limited purpose.)

43. On January 18, 2017, CHT announced that at a general meeting held on that same date, CHT's shareholders approved the Merger Agreement. On January 26, 2017, CHT announced that in connection with the merger, it requested a suspension of trading of its shares.

44. On January 30, 2017, CC Capital CHT Holdco, LLC ("**Sponsor Holdco**"), an affiliate of the Sponsor, obtained a controlling interest in CHT Holdco (CHT's parent) pursuant to the Merger Agreement and a Subscription Agreement. The merger was a "go private transaction" structured such that Sponsor Holdco, a special purpose entity managed by the Sponsor would own a controlling interest in CHT Holdco, with the remaining interest in CHT Holdco owned by Alpha Cepheus, LLC, an entity which was, controlled by Parmar (the "**Merger**"). The Merger resulted in the Sponsor owning a controlling interest in CHT (through CHT Holdco).

45. To finance the Merger, (i) the Sponsor contributed approximately $82.5 million of cash (as equity) to CHT Holdco, (ii) CHT obtained $130.0 million in financing from the Lenders (plus a $15.0 million commitment) pursuant to the Pre-Petition Credit Agreement discussed below, and (iii) CHT issued unsecured promissory notes to its shareholders in the amount of approximately $39.6 million.

46. In connection with the Merger, the parties valued CHT at $309.4 million, or approximately $3.36 per share.

47. Orion operated several business lines: revenue cycle management business, which provided hospital-based and office-based physicians with medical billing and services, giving them more time to focus on patient care (the "**Orion RCM Business**"). These services include coding, reimbursement services, charge entry, claim submission, collection activities, and financial reporting services. These services are designed to help clients by improving cash flows and reducing administrative costs and burdens. MBS, Rand, RMI, Western Skies, NEMSWV, NEMSLLC, and PPP OpCo all operate as part of the Orion RCM Business to provide RCM services to physician practices throughout the country.

48. The Orion RCM Business operates out of 6 locations: (a) Simi Valley, California, (b) Lakewood, Colorado, (c) Houston, Texas, (d) Monroeville, Pennsylvania, (e) Parkersburg, West Virginia, and (f) Jericho, New York. Each location manages and services its own customer base and handles its own "front office" operations and relationships. Institutional knowledge about each customer (and relevant payor rules) rests with each US-based team at each location. The Orion RCM Business services approximately 170 customers.

**The Credit Agreement With the Lenders**

49. As part of the overall Merger transaction, Orion entered into that certain Credit Agreement, dated as of January 30, 2017 (as amended, modified or supplemented from time to time, the "**Prepetition Credit Agreement**"), by and among Orion, as Borrower, the guarantors that are parties thereto (which, as of the Petition Date, included the remainder of the Debtors: CHT, NEMS Acquisition, NEMSLLC, NEMSWV, PPP OpCo, PPP HoldCo, MBS, Rand, RMI, Western Skies, IPS, NYNM Acquisition, LLC, Northstar FHA, Northstar FH, Vachette, MDRX, Vega, ACA, ABC, Phoenix and New York Network Management, L.L.C.) (collectively, the "**Guarantors**" and together with Orion, the "**Loan Parties**"), the lenders party thereto from time to time, Bank of America, N.A., as Administrative Agent, L/C Issuer, and Swingline.

50. Bank of America, N.A. ("**BoA**"), BMO Harris Bank, N.A. ("**BMO**"), Keybank National Association ("**Keybank**"), Stifel Bank & Trust ("**Stifel**") and Woodforest National Bank ("**Woodforest**") lent Orion and affiliates more than $160 million in reliance on the representations from RRBB that it had performed audits in accordance with the auditing standards and that Orion's financial statements were fairly stated.

51. BoA received RRBB's representation in Massachusetts and made its investment decision in reliance on RRBB's representations in Massachusetts.

52. BMO received RRBB's representation in Indiana and made its investment decision in reliance on RRBB's representations in Indiana.

53. Keybank received RRBB's representation in Ohio and made its investment decision in reliance on RRBB's representations in Ohio.

54. Stifel received RRBB's representation in Missouri and made its investment decision in reliance on RRBB's representations in Missouri.

55. Woodforest received RRBB's representation in California and made its investment decision in reliance on RRBB's representations in California.

56. The Loan Parties' total secured debt obligations to the Lenders under the Prepetition Credit Agreement and related documents totaled approximately $159.3 million of principal consisting of obligations under the Term Loans and the Bridge Loan (as such terms are defined below).

**The Fraud is Discovered**

57. On May 16, 2018, Parmar was arrested by the FBI and charged with orchestrating a $200 million fraud through sham acquisitions.

58. On May 16, 2018, the SEC filed a complaint against Parmar and others for securities fraud. The SEC alleged that The Orion Group financial statements certified by RRBB

contained material misrepresentations about The Orion Group's historical and expected future revenues and earnings before interest, taxes, depreciation, and amortization ("**EBIDTA**"), including the revenues and EBITDA of three fictitious subsidiaries that did not in fact exist, and CHT's purported customer base, including purported customers of the three fictitious subsidiaries.

**The Fictitious Acquisitions**

59. Certain of CHT's subsidiaries, which were represented to be operating businesses with their own customers and revenue, are fictitious—they have no business operations, employees, customers, or revenue. These fictitious subsidiaries include MDRX, Phoenix, and Northstar, which were the subject of sham acquisitions. Each of these purported acquisitions was funded with money raised by CHT in the secondary offerings of its stock through the AIM. However, rather than funding the purchase of an actual operating business, the money raised by CHT was used for other purposes, including apparent misappropriation and the funding of a scheme to create the impression of revenue from fictitious customers.

60. CHT issued a press release on September 16, 2015, announcing its supposed acquisition of Northstar for $18 million. The press release describes Northstar as an operating company that has 233 employees, 77 clients, and 2014 year-end revenue of $7.9 million. This was a sham acquisition, and Northstar was not a real business.

61. On September 18, 2015, just two days after the supposed Northstar transaction, CHT announced its acquisition of Phoenix, describing the company as employing 138 people and generating revenue of $9.8 million, EBITDA of $2.2 million, with net assets of $1.1 million as of December 31, 2014. CHT's 2016 Financial Statements indicate that CHT "acquired certain Revenue Cycle Management company assets hereinafter Phoenix, based out of New Jersey,

USA" for $13.66 million. This was a sham acquisition. A bank account and EIN for Phoenix were not obtained until after the acquisition.

62. Journal entries in the CHT general ledger indicate recorded payments of $8.5 million and $7.5 million on September 30, 2015, for the purchase of Northstar and Phoenix, respectively. However, the activity in the bank statements for the M&T Accounts indicates that the $15.8 million in proceeds from the secondary offering were disbursed in multiple transactions over the next six months that do not appear to relate to the purchase of Phoenix or Northstar.

63. CHT announced that it acquired MDRX on February 10, 2016. The M&T Checking Account statement indicates that the $36.9 million was transferred to various recipients over the next six months, and none of the transfers correlate to the entry in the general ledger indicating that these funds were used for the acquisition payment for the fictitious MDRX. This was a sham acquisition. Approximately $4.0 million of the above disbursements were used to create fictitious customer revenue through the re-characterization of inter-bank transfers as customer collections.

64. During the Summer of 2016, CHT engaged in negotiations with the then owners of ACA and ABC regarding CHT's acquisition of ACA and ABC. On September 1, 2016, CHT, through a holding company, Vega, acquired both ACA and ABC for a combined sum of $4.68 million. Subsequently, CHT reported that it acquired Vega, the holding company, for $24.0 million.

**Orion Bankruptcy and Creation of Trust**

65. As a result of the fraud that RRBB failed to discover, with the exception of New York Network Management, L.L.C., which filed on July 5, 2018, The Orion Group was forced to

file for bankruptcy protection under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in this Court on the Petition Date.

66. RRBB filed the RRBB Claim on June 4, 2018, in the amount of $193,410 based on its audits of the Debtors' finances in accord with the Engagement Letters defined below.

67. On February 26, 2019, The Orion Group filed the Plan, which became effective on March 1, 2019.

68. As part of The Orion Group bankruptcy, Howard M. Ehrenberg was appointed as the Liquidating Trustee under that Liquidating Trust Agreement, and, as set forth above, all of The Orion Group's and the Lender's claims (relating to The Orion Group) against RRBB were assigned to the Trust, and the Liquidating Trustee was authorized to pursue those claims on behalf of the Trust.

**RRBB's Negligent Audits and False Certifications**

69. At all relevant times, RRBB served as The Orion Group's external, independent auditor and was required to perform its audits in accordance with generally accepted auditing standards ("**GAAS**") to ensure that The Orion Group's financial statements were fairly presented in compliance with generally accepted accounting principles ("**GAAP**") (GAAS and GAAP collectively, the "**Standards**"). RRBB was obligated to (a) perform its audit in accordance with GAAS, (b) design the audit to obtain reasonable assurance of detecting errors, fraud, or illegality that would have a material impact on financial statement amounts, and (c) obtain an understanding of internal controls over financial reporting in order to design and execute audit procedures to detect a material misstatement. RRBB violated these Standards and failed to be independent in auditing The Orion Group.

70. RRBB entered into engagement letters with The Orion Group for each of the audit years 2014 through 2016 (the "**Engagement Letters**").

71. In each of the audit years 2014 through 2016, RRBB represented in the Engagement Letters that it would "plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether from (1) errors, (2) fraudulent financial reporting, (3) misappropriation of assets, or (4) violations of laws or governmental regulations that are attributable to the Company or to acts by management or employees acting on behalf of the Company."

72. At the conclusion of each audit, RRBB certified that it had performed its audit work in accordance with applicable professional Standards and that The Orion Group's financial statements were fairly stated in all material respects in accordance with GAAP.

73. On March 16, 2015, March 21, 2016, May 25, 2017, RRBB issued Independent Audit Reports (the "**Audit Reports**") that stated: "the consolidated financial statements present fairly, in all material respects, the financial position of Constellation Healthcare Technologies." RRBB should have known this certification was false.

74. The Audit Reports also stated: "We believe the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion." RRBB either knew or should have known this statement was false because the audit evidence was grossly insufficient to support the Audit Reports.

75. The Audit Reports also stated: "We conducted our audits in accordance with auditing standards generally accepted in the United States." RRBB either knew or should have known this statement was false because its audits grossly violated auditing standards.

76. RRBB's audits of The Orion Group's financial statements were not done in accordance with the Standards, but were grossly negligently performed in every year. If RRBB had performed its audit work in accordance with the Standards, it would have detected the

material misstatements and/or the Looters' fraud as early as May 2015 (but in no case later than September 2015), and the Lenders would have avoided the damages the Liquidating Trustee seeks against RRBB in this Complaint.

77. The Orion Group's financial statements for 2015 and 2016 were materially misstated due to fraud. This meant that RRBB's certifications of The Orion Group's financial statements were false. Specifically, The Orion Group's revenues, assets and EBITDA were falsely inflated by significant amounts in both 2015 and 2016.

78. For example, most—in some cases, all—of the customers and associated revenue of MDRX, Orion, and Phoenix were fake.

79. The fictitious revenue associated with MDRX, Phoenix, and The Orion Group entities and customers discussed totaled at least $30.9 million for the six-month period ending June 30, 2016. This represented a nearly ***fifty percent overstatement*** of The Orion Group's revenues.

80. On June 30, 2016, RRBB participated in a conference call with various individuals at Bank of America, including David Hooke and Thomas Paulk. During this conference call, the RRBB audit team, including Howard Condo, made representations to Bank of America about its audit work. In particular, RRBB falsely assured Bank of America that it had 1) conducted its audits in accordance with the Standards and 2) audited the material transactions of The Orion Group. RRBB concealed the facts that it had not conducted its audits in accordance with the Standards and that it had not audited material transactions.

81. Moreover, RRBB certified more than $60 million of supposed assets of MDRX, Phoenix and Orion, which represented approximately 38% of the total assets of The Orion

Group. Had RRBB tested for the existence of these assets in accordance with the Standards, it would have discovered that they did not exist.

**Applicable Auditing Standards**

82. In performing its audits of Orion, RRBB was required to follow the standards and/or principles set forth in the Standards. RRBB violated most of these Standards, including by failing to do the following:

- Adequately plan the work and properly supervise any assistants;
- Obtain a sufficient understanding of the entity being audited and its environment, including its internal controls, to assess the risk of material misstatement of the financial statements whether due to error or fraud, and to design the nature, timing, and extent of further audit procedures; and
- Obtain sufficient appropriate evidential matter to afford a reasonable basis for an opinion regarding the financial statements under audit.

83. The Standards also require the auditor to understand (i) the audit client, customer relationships, industry conditions, economic conditions, regulatory environment, relevant accounting pronouncements, and other external factors; and (ii) whether the audit client has properly designed and implemented internal controls relevant to the audit.

84. To comply with GAAS, the auditor needs to identify risks of material misstatement at appropriate levels of detail and design appropriate auditing procedures in light of such risks. Due professional care requires the auditor to exercise professional skepticism – i.e., a questioning mind and a critical assessment of audit evidence based on the assumption that management is neither dishonest nor honest beyond doubt.

85. Under GAAS, the audit procedures selected by the auditor generally depend on the risk of material misstatement. The higher the auditor's assessment of risk, the more reliable and relevant the audit evidence obtained from audit procedures must be. The auditor must plan and perform the audit to obtain sufficient appropriate evidential matter to afford a reasonable basis for an opinion regarding the financial statements and to reduce to a low level the risk that the auditor will fail to detect a material misstatement. If the auditor is unable to obtain sufficient appropriate evidential matter, the auditor should express a qualified opinion or a disclaimer of opinion.

86. RRBB violated the Standards in each and every audit of The Orion Group, and its Audit Reports lacked the sufficient evidentiary support required by the Standards.

**RRBB's Failure to Understand The Orion Group's Risks**

87. In each of its audits, RRBB failed to obtain a sufficient understanding of The Orion Group's operations required to plan the audit properly, make an accurate assessment of audit risks, and design effective audit procedures. RRBB also relied on tests purportedly performed by others to confirm the effectiveness of internal controls, but it failed to recognize that no such tests had in fact been conducted. Finally, in a number of specific areas, RRBB's execution of planned audit procedures was carried out so carelessly that the audit evidence did not provide a valid basis for its conclusions and its unqualified audit opinion.

88. RRBB violated the Standards during the audit planning process by not giving adequate consideration to significant audit issues and risks, including the existence of related party transactions, significant unusual and/or unexpected relationships involving revenue and income. These circumstances were serious fraud risk factors that significantly increased the risk that The Orion Group's financial statements were materially misstated due to fraud. Yet, RRBB's audit design was devoid of appropriate procedures to address these risks.

**RRBB Failed to Audit Material Transactions to Confirm Occurrence**

89. As part of their fraud, the Looters created fake entities and fake transactions. For example, in September 2015, the Looters represented to RRBB that The Orion Group acquired Northstar and Phoenix for $18 million and $13.67 million, respectively, through merger transactions. Similarly, in January 2016, the Looters represented to RRBB that The Orion Group had acquired MDRX for $30 million through a merger. These transactions (the "**Transactions**") were fictitious and used by the Looters to give the appearance that The Orion Group's revenues and assets were growing.

90. Had RRBB audited the Transactions, as it was required to do under the Standards, it would have discovered that the Transactions did not occur and that the assets supposedly acquired did not exist.

91. Had RRBB done its job in accordance with the Standards, it would have discovered the obvious fact that the companies supposedly acquired in the Transactions did not exist.

92. The Standards did not permit RRBB to simply accept the representations of the Looters that the Transactions occurred. RRBB was required by the Standards to obtain reliable third-party confirmation that the Transactions occurred. RRBB failed to do so in violation of AU-C Sections 500, 505, and 580 of the Standards.

93. Had RRBB complied with the Standards and sought third-party confirmation of the Transactions, it would have discovered the fraud as early as May 2015, but in no case any later than September 2015.

94. RRBB violated AU-C Sections 240 and 500, among other GAAS standards. RRBB breached its duty under GAAS to exercise appropriate professional skepticism.

95. RRBB thus was negligent in failing to obtain adequate audit evidence for the Transactions. As a result, RRBB should never have issued its opinions that The Orion Group's financial statements were fairly presented in accordance with GAAP.

**RRBB Failed to Confirm the Existence of Material Assets**

96. The Looters claimed that the Transactions resulted in a material increase of more than $50 million in the assets of The Orion Group. Because the Transactions were fake, this representation was false.

97. Under the Standards, RRBB was required to confirm the existence of these material assets and to obtain reliable audit evidence to support management's assertions regarding the existence of these assets. RRBB failed to do so in violation of AU-C 500 and 505 of the Standards.

98. Had RRBB attempted to verify the existence of these assets through third-party confirmations or some other form of reliable audit evidence, it would have discovered the transactions were fake and the assets did not exist. This failure was a violation of AU-C Sections 200, 240, and 5001, among other Standards.

**RRBB Failed to Audit The Orion Group's Revenue**

99. The Looters claimed that The Orion Group's revenues had increased by more than $30 million as a result of the Transactions. This allowed the Looters to artificially inflate the market value of The Orion Group. The Looters' representations were false, because the Transactions were fake.

100. RRBB failed to audit The Orion Group's revenues in accordance with the Standards. Moreover, under AU-C Section 240 of the Standards, RRBB was required to presume fraud in the context of revenue recognition.

101. RRBB failed to apply any skepticism, much less a presumption of fraud, to management's revenues assertions and simply certified the fraudulent revenue based on representations from the Looters, in violation of AU-C Sections 240 and 580 of the Standards.

102. RRBB's audit confirmation procedures also were deficient in light of the potential fraud risks, including AU-C Sections 240, 500, 505, 200, and 300 of the Standards. Specifically, RRBB failed to obtain appropriate third-party confirmations or the confirmation evidence that RRBB obtained was unreliable. RRBB violated the Standards with respect to confirmation control, proficiency of its auditors, lack of supervision by senior auditors, and the failure to exercise due professional care and appropriate professional skepticism.

103. In reliance on RRBB's negligent misrepresentation that The Orion Group's financial statements were fairly stated, The Orion Group incurred more than $160 million dollars in debts that it is unable to repay. Had RRBB done its job with reasonable care, the Lenders would have avoided their losses.

**FIRST CAUSE OF ACTION**
**NEGLIGENT MISREPRESENTATION**

104. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 103 as if fully set forth herein.

105. The Lenders have assigned all of their claims against RRBB relating to The Orion Group to the Trust, on behalf of which the Liquidating Trustee brings those claims here.

106. RRBB is the certified public accountant firm that audited the consolidated financial statements of The Orion Group and performed accounting services for The Orion Group. As professional accountants, RRBB's express purpose was to audit the consolidated financial statements for The Orion Group for the benefit of the public, including the Lenders, to perform those audits in conformance with GAAS and GAAP and the professional standards set

forth in RRBB's own audit manuals, and to form and express opinions about whether those consolidated financial statements were presented fairly, in all material respects, in conformity with GAAP. The standards, which RRBB specifically affirmed, required RRBB to plan and perform its audits to obtain reasonable assurance as to whether the financial statements are free of material misstatement due to error or fraud.

107. RRBB knew at the time of the engagement by The Orion Group, and confirmed with The Orion Group after the time of the engagement, that RRBB's Audit Reports on The Orion Group would be made available to the Lenders, who were specifically identified to RRBB in connection with the transactions at issue between The Orion Group and the Lenders.

108. RRBB knew that the Lenders intended to rely upon RRBB's Audit Reports in connection with the transactions between The Orion Group and the Lenders.

109. RRBB directly expressed to the Lenders its understanding that the Lenders would be relying on RRBB's Audit Reports.

110. RRBB owed a duty to the Lenders and knew that its work was being relied on by the Lenders for the transactions at issue. Specifically, RRBB knew and intended that The Orion Group's financial statements and the Audit Reports provided in connection therewith would be furnished to the Lenders for the express purpose of inducing the Lenders to enter into debt transactions with and/or for the benefit of The Orion Group, and that the financial statements and Audit Reports would be relied upon by the Lenders in connection therewith. RRBB owed a duty to the Lenders to exercise reasonable care and competence in making the statements set forth in RRBB's Audit Reports.

111. Consistent with RRBB's understanding, RRBB's Audit Reports were provided to the Lenders.

112. The Lenders justifiably relied upon RRBB's negligent Audit Reports to their detriment. The Lenders justifiably relied upon RRBB's Audit Reports in entering into transactions with The Orion Group (and other third parties), through which the Lenders lost more than $160 million.

113. RRBB breached its duty by performing negligent audits and making at least the following untrue statements in its Audit Reports: (i) The Orion Group's consolidated financial statements presented fairly, in all material respects, the financial position of The Orion Group in conformity with GAAP and that RRBB was independent; (ii) RRBB had a reasonable basis for making the statements contained in its audit reports; (iii) RRBB conducted its audits in accordance with GAAS; (iv) the financial statements were free of material misstatements; and (v) certifying as real fake assets and materially misstated financial statements. As a direct and proximate result of their reliance upon RRBB's negligent audits and resulting misrepresentations, the Lenders incurred substantial losses in amounts to be proven at trial.

**SECOND CAUSE OF ACTION**
**PROFESSIONAL MALPRACTICE**

114. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 113 as if fully set forth herein.

115. RRBB is the certified public accountant firm that audited the consolidated financial statements of The Orion Group and performed accounting services for The Orion Group. As professional accountants, RRBB's express purpose was to audit the consolidated financial statements for The Orion Group for the benefit of the public, including the Lenders, to perform those audits in conformance with GAAS and GAAP, professional standards set forth in RRBB's own audit manuals, and to form and express opinions about whether those consolidated financial statements were presented fairly, in all material respects, in conformity with GAAP.

The standards, which RRBB specifically affirmed, required RRBB to plan and perform its audits to obtain reasonable assurance as to whether the financial statements are free of material misstatement due to error or fraud.

116. RRBB breached its duty by performing negligent audits and making at least the following untrue statements in its Audit Reports: (i) The Orion Group's consolidated financial statements presented fairly, in all material respects, the financial position of The Orion Group and its subsidiaries in conformity with GAAP and that RRBB was independent; (ii) RRBB had a reasonable basis for making the statements contained in its Audit Reports; (iii) RRBB conducted its audits in accordance with GAAS; (iv) the financial statements were free of material misstatements; and (v) certifying as real fake assets and materially misstated financial statements.

117. The Lenders justifiably relied upon RRBB's negligent Audit Reports to their detriment.

118. As a direct and proximate result of their reliance upon RRBB's negligent audits and resulting misrepresentations, the Lenders incurred substantial losses in amounts to be proven at trial.

**THIRD CAUSE OF ACTION**
**OBJECTION TO PROOF OF CLAIM**

119. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 118 as if fully set forth herein.

120. Pursuant to section 502(b)(1) of the Bankruptcy Code, a claim may be allowed except to the extent that "such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured."

121. RRBB's faulty audits of the Debtors' financial condition serve as a basis for the RRBB Claim.

122. Based on the facts set forth in this Complaint, RRBB breached its duty to the Debtors and breached the Engagement Letters themselves by failing to conduct the audits of the Debtors' finances in accord with the Engagement Letters, in which RRBB represented that it would "plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether from (1) errors, (2) fraudulent financial reporting, (3) misappropriation of assets, or (4) violations of laws or governmental regulations that are attributable to the Company or to acts by management or employees acting on behalf of the Company."

123. Because of RRBB's breach of duty to the Debtors and breach under the Engagement Letters, the Debtors did not receive the value of the services contracted for, and the value of the claim exceeds the negligible value of any purported services provided. The RRBB Claim for payment under the Engagement Letters should be disallowed, and the RRBB Claim should be expunged.

**FOURTH CAUSE OF ACTION**
**EQUITABLE SUBORDINATION**

124. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 123 as if fully set forth herein.

125. In the event that the RRBB Claim is not disallowed, the RRBB Claim must be subordinated pursuant to section 510(c) of the Bankruptcy Code. Under section 510(c), a claim must be subordinated if (a) the creditor engaged in inequitable conduct, (b) the misconduct caused injury to the Debtors' creditors and (c) the remedy of subordination is not inconsistent

with the Bankruptcy Code. *In re Monahan Ford Corp. of Flushing*, 340 B.R. 1, 44 (Bankr. E.D.N.Y. 2006).

126. Based upon the facts set forth in this Complaint, RRBB engaged in inequitable conduct by breaching its duty to the Debtors to conduct the audits in conformance with the Standards and making at least the following untrue statements in its Audit Reports: (i) The Orion Group's consolidated financial statements presented fairly, in all material respects, the financial position of The Orion Group and its subsidiaries in conformity with GAAP and that RRBB was independent; (ii) RRBB had a reasonable basis for making the statements contained in its Audit Reports; (iii) RRBB conducted its audits in accordance with GAAS; (iv) the financial statements were free of material misstatements; and (v) certifying as real fake assets and materially misstated financial statements.

127. RRBB's misconduct caused substantial injury to the creditors of the Debtors estates and the remedy of subordination of the RRBB Claim is not inconsistent with any provision of the Bankruptcy Code.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests judgment against Defendant, under all applicable causes of action, as follows:

1. actual, compensatory and consequential damages in an amount to be proven;
2. rescission or rescissory damages;
3. pre-judgment and post-judgment interest as allowed by law;
4. disallowance or equitable subordination of the RRBB Claim; and

5. such other and further legal and equitable relief as the Court deems just and proper.

Dated: September 30, 2020
New York, New York

Respectfully submitted,

Duane Morris LLP

By: /s/ Christopher R. Belmonte
Christopher R. Belmonte, Esq.
Pamela A. Bosswick, Esq.

230 Park Avenue, Suite 1130
New York, New York 10169
Telephone: (212) 818-9200
Facsimile: (212) 818-9606

and

Stephen Sorensen. (CA No. 199408)
THOMAS, ALEXANDER, FORRESTER
AND SORENSEN LLP
14 27th Avenue
Venice, California 90291
Telephone: (310) 961-2536
Facsimile: (310) 526-6852

*Attorneys for Howard M. Ehrenberg, Liquidating Trustee*

**DEMAND FOR JURY TRIAL**

Pursuant to Fed. R. Civ. P. 38(b), as made applicable here by Fed. R. Bankr. P. 9015, Plaintiff hereby demands a trial by jury of all issues so triable.

Dated: September 30, 2020
New York, New York

Respectfully submitted,

Duane Morris LLP

By: /s/ Christopher R. Belmonte
Christopher R. Belmonte, Esq.
Pamela A. Bosswick, Esq.

230 Park Avenue, Suite 1130
New York, New York 10169
Telephone: (212) 818-9200
Facsimile: (212) 818-9606

and

Stephen Sorensen. (CA No. 199408)
THOMAS, ALEXANDER, FORRESTER AND SORENSEN LLP
14 27th Avenue
Venice, CA 90291
Telephone: (310) 961-2536
Facsimile: (310) 526-6852

*Attorneys for Howard M. Ehrenberg, Liquidating Trustee*